HARRIS, Judge.
Appellant was convicted of robbery and sentenced to ten years imprisonment in the penitentiary. He was represented at arraignment and trial by court-appointed counsel. He pleaded not guilty. After sentence was imposed, he gave notice of appeal and petitioned for a free transcript. He was furnished a free transcript and trial counsel was appointed to represent him on appeal.
The evidence is conflicting but it is undisputed that between. 8:00 and 8:30 p. m., on June 4, 1974, a black man robbed Love-man’s Department Store in Huntsville, Alabama, at gunpoint and escaped with nearly $5,000.00. Eleven months later a man identified as appellant was picked out of a lineup in Rochester, New York, as the robber. There was an extradition hearing and he was ordered to be returned to Alabama to stand trial. His defense was an alibi and during his testimony he never attempted to explain to the jury why he left Alabama immediately after the robbery and went to the state of New York.
Prior to trial appellant made a motion to suppress the eye witness testimony of the two women who were robbed in the Credit Department of Loveman’s on the night of June 4, 1974, and a full blown hearing was held on this motion. At the conclusion of this hearing the motion to suppress was overruled and denied.
Testifying for the State were Ms. Debbie New and Ms. Barbara Collins who were alone in the Credit Department at the time of the actual robbery. The store closed at 9:00 p. m. and all the customers had just left the store.
Around 8:10 p. m. on the night of the robbery the bandit approached Ms. New to discuss opening a credit account with Loveman’s. At this time Ms. New was waiting on several customers and she told him she would get with him as soon as she could. Ms. Collins was on break at the time the bandit approached Ms. New, but she returned to the Credit Department while the robber was still standing there and Ms. New asked Ms. Collins to wait on him. Ms. Collins discussed the procedure to open a credit account and handed the man a credit application form and told him to complete the form and either leave it with her or mail it in as it would take a *799 few days to process it. The man took the application form and walked to the furniture department where he met another black man and both of them began to look over the application form. A few minutes later both men walked further back in the store out of sight of Ms. Collins:
After the last customer left the store, the man returned to the Credit Department and laid the application form on the counter and asked some more questions concerning it. Then suddenly and without any warning he jumped over the swinging door leading into the Credit Department and pulled a pistol out of his pocket and stated he wanted the money. Ms. New stepped back and the bandit nudged her with the pistol and told her not to move again but to get the money. Ms. New hesitated and the bandit nudged her again and demanded the money. Ms. Collins looked at Ms. New and Ms. New told her to give him the money. Both Ms. New and Ms. Collins went to each cash register and got the money bags and brought them to the counter in the Credit Department where the bandit was standing with the pistol in his hand. He asked them for a large bag to put the money bags in and they told him they did not have a large bag. The robber saw a box under the counter and told them the box would do. One of them handed him the box and he put the money bags in the box and put a top on the box and went through the swinging door and ran out the back of the store. Ms. New ran to the switchboard operator and asked her to call the security guard and she started in pursuit of the bandit toward the back door. As she approached the rear of the store she saw the other black man with whom the robber had conferred in the furniture department and she froze as she did not know if this man was armed. This man followed the man with the box of money out the back door. When Ms. (New finally got to the back door she did not see either one of the men and did not see an automobile in which the men made their escape.
Both women testified they got a good look at the robber with the gun as they were in close quarters with him in a well lighted store and at times were within six inches to two feet from him during the robbery and he was not disguised in any way. They stated that from the time he first asked for the credit application until the robbery was completed the time lag was from ten to fifteen minutes.
Ms. New testified that the robber had on a shirt that had big flowers on it, brown with white centers, and a pair of brown knit slacks and black boots. He had a fairly short Afro and his hair was braided. She stated he didn’t have a beard or mustache at the time of the robbery but he had a beard and mustache at the trial. She further testified that about a week before the trial she went to the District Attorney’s Office where she was shown a photograph of the lineup in Rochester, New York. There were five black men in the lineup and one of them looked like the robber but she wanted to see a close-up picture of the man. She was' shown a close-up photograph and as soon as she saw it, she immediately identified appellant as the robber. She then was shown the lineup photograph again and picked number 4 as the man who robbed them on June 4, 1974. She made a positive in-court identification of appellant as the bandit and said she could have identified him in person .without regard to the photographs and that she based her identification on seeing him for ten to fifteen minutes during the robbery. She withstood a vigorous cross-examination and was never shaken in her identification of appellant as the bandit.
Ms. Collins testified that following the robbery she viewed numerous mug shots on several occasions and one lineup of four men and that appellant was not in any of the photographs she saw.
*800 She further testified that around March 1, 1975, she went to Rochester, New York, with Tim Morgan from the District Attorney’s Office of Madison County, and Detective Dick Yearick of the Huntsville Police Department where she attended a lineup. They were met by a member of the Rochester Police Department and a representative from the District Attorney’s Office. She viewed a lineup of five black men and immediately identified appellant as the man who robbed her and Ms. New on the night of June 4, 1974, in the Credit Department of Loveman’s in Huntsville, Alabama. As soon as the five men took their places in the lineup, she held up four fingers to signify that the number four man was the robber. The next day she went to an extradition hearing and identified appellant again as the robber.
At trial she made a positive in-court identification of appellant and stated that if no lineup had ever been conducted, she still would be able to identify appellant based solely on her observation of him during the robbery and her face to face conversation with him concerning the credit application she personally handed him. In her words, “I would be able to identify the man when I came face to face to him, no matter whether a lineup or on the street.”
There was an extensive voir dire examination of both Ms. New and Ms. Collins in an attempt to suppress their identification of appellant as the robber. At the conclusion of the hearing the Court denied the motion to suppress.
Detective Richard Yearick of the Huntsville Police Department was assigned to investigate the robbery and he went to Loveman’s that night and talked to both Ms. New and Ms. Collins and generally inspected the scene where the robbery occurred. He observed the credit application on the counter where appellant placed it just before he jumped over the swinging door and committed the robbery. He saw the open money drawers and was advised where the robber placed his hands. He immediately had these areas blocked off so that no one would have access to them and called Mr. Van Pruitt from the Department of Toxicology to come to the scene and process the same for evidence. No one touched the credit application before Mr. Pruitt arrived and took the application in his possession. In the course of his investigation he was advised that the money was placed in a white cardboard box and the robber left the store with this box in his possession. He was also advised by other police officers that they found a vehicle fitting the description of the one used in the robbery. The car was located in the 1500 block of Timber Lane. The detective went to this location and found a 1966 Pontiac Tempest, 1974 Alabama tag number 47-78703. The car windows were down and he looked in the back seat and saw a white box with “Curtis 1000 Inc., Identi-Matic Envelopes, IM-622-A,” on it. The car was impounded and taken to Loveman’s Store where Mr. Pruitt removed the box and several other items. He stated that the box was later identified as the one the robber used to carry the money bags in.
This officer further testified that Mr. Van Pruitt, Assistant State Toxicologist, picked up the credit application and put it in a plastic envelope and carried it with him.
This officer testified on cross-examination that warrants were issued for appellant, Winfred Ford and Roderick McElroy. He further stated that McElroy was serving time as a result of this case, that Ford was serving time in Tennessee, and appellant was then on trial for the Loveman robbery.
Mr. Van Pruitt testified that he was employed as Assistant Director of the Huntsville branch of the Department of Toxicology and Criminal Investigation. After stating his education, experience and qualifications and that he had been in *801 charge of the Huntsville office since 1964, he was asked if he had any training in lifting fingerprints and he answered in the affirmative. He further testified that he picked up the credit application from the counter where Ms. New and Ms. Collins told him the bandit put it. This credit application was introduced in evidence as State’s Exhibit 1. Latent fingerprints were lifted from the credit application, from the counter in the credit area of Loveman’s Store, from the cardboard box found in the automobile, and four latent prints from the Pontiac Tempest automobile. Some ten latent prints were sent to the Federal Bureau of Investigation in Washington, D. C.
Mr. Ramon Dale Drayer who was employed by the Federal Bureau of Investigation as a fingerprint specialist came to Huntsville and testified for the State at appellant’s trial. The qualifications and experience of this witness were most impressive. He had been with the Bureau for 21 years and the latent fingerprints he had examined in that length of time ran into the millions. He testified that on State’s Exhibit 1 (credit application handled by appellant) there were three latent fingerprints of value.
After appellant was returned to Alabama he was fingerprinted at the jail in Huntsville and this fingerprint card was sent to Mr. Drayer for comparison with the other latent fingerprints which were sent him. This card was introduced as State’s Exhibit 10. Mr. Drayer made a comparison of the three latent prints on the credit application with the fingerprint card and testified as follows:
“There were three latent fingerprints of value. They were present on State’s Exhibit 1. And they are identical with the fingerprints appearing on State’s Exhibit 10, fingerprint card.”
The taking of a fingerprint exemplar after arrest without counsel present does not violate one’s Fifth Amendment privilege against self-incrimination or one’s sixth Amendment right to counsel and testimony of a fingerprint expert is admissible. United States v. Gibson, 5 Cir., 444 F.2d 275; Davis v. State, 33 Ala.App. 68, 29 So.2d 877.
An in-court identification of an accused by a witness who has viewed the accused in a lineup before trial, without counsel or the waiver of counsel, is not admissible unless an independent origin of the identification is established.
Based on the testimony of Ms. New and Ms. Collins we hold that the in-court identification was not tainted by the lineup. This is a clear case of an “independent source.” It would serve no useful purpose to repeat their testimony as above set forth. Hannon v. State, 48 Ala.App. 613, 266 So.2d 825; Smith v. State, 49 Ala.App. 147, 269 So.2d 164; Houston v. State, 49 Ala.App, 403, 272 So.2d 610.
The “independent source” is explicit in Ms. Collins’ statement: “I would be able to identify the man when I came face to face to him, no matter whether a lineup or on the street.”
Appellant makes much of the fact that he was the only one of the five men in the lineup that had on a “red” tee shirt and thus the officers arranged it that way to focus attention on him. Appellant’s own testimony on direct examination refutes any suggestion that the attire worn by the men in the lineup was attributable to “official cunning.” From the record:
“Mr. Moore: How were you dressed?
“Mr. Lindsey: Dressed in a red shirt.
“Q. Who gave you that red shirt?
“A. I had the red shirt. It was a red shirt I had under here.
*802 “Q. How were all these people dressed ?
“A. All the rest dressed in uniforms, uniforms from the county. See, in the county up there the one who gets time they dress in different uniforms. The one who did not get time they dress in a different one. So, all the fellows in the lineup were dressed in a similar sentence (sic) uniforms and I was the only one who did not have his on.”
Conflict in alibi testimony presented by the defendant and identification testimony presented by the robbery victims was peculiarly within the province of the jury to resolve. Smith v. State, 53 Ala.App. 27, 296 So.2d 925; Price v. State, 53 Ala.App. 465, 301 So.2d 230.
The testimony of the fingerprint expert from the Federal Bureau of Investigation in Washington, D. C. exploded appellant’s alibi; and the jury so found along with the testimony of the two victims of the robbery.
There was no motion to exclude the State’s evidence; there was no motion for a new trial; there was no request for the affirmative charge; and no exceptions were reserved to the oral charge to the jury. In this state of the record nothing is presented to this Court for review. Eady v. State, 48 Ala.App. 726, 267 So.2d 516; Goodman v. State, 52 Ala.App. 265, 291 So.2d 358; Hall v. State, 57 Ala.App. 132, 326 So.2d 660.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
TYSON, DeCARLO and BOOKOUT, JJ., concur.